# EXHIBIT B

News    Features    Podcasts    Magazine    Newsletter    Blogs    Directory    Jobs    Advertise    Subscribe

Commitment to Service    Port of LONG BEACH
THE PORT OF CHOICE

**TOP STORIES**

USCG Intercepts $29M
Cocaine Shipment Off Costa
Rica

Seafarer Lost Over the Side
Near Fos-sur-Mer

Genting Announces
Enhanced COVID-19
Preventative Measures

Concerned Seafarers Call for
Greater Access to PPE

**MORE** TOP STORIES

RNLI Asks Public to Avoid Seagoing
Activities Due to Risk for Rescuers

Carnival Cruise Line Extends Pause

Charterers Beware: Supreme Court
Affirms Strict Liability Standard

U.S. Coast Guard to Grant Extensions
for BWTS Installation

**EDITORIALS** TOP STORIES

The Achilles Heel of Shipping

Port Denials: What are States'
International Obligations?

Will People Cruise Again?

Vanishing Food Waste Floats Maritime
and National Law

NHC Hosts Annual Mariner
Decision Makers Weather Workshop

Follow us

**6681** Views    **485** Shares

# The "New" Human Rights at Sea Debate

BY SOFIA GALANI 02-12-2019 05:22:45

Dr Sofia Galani, one of Human Rights at Sea's Non-
Executive Board of Advisors, gave a presentation at
the Bath Royal Literary and Scientific Institution last
month on the topic of maritime security and human
rights.

The "human rights at sea" debate is rather recent.

There are at least three developments that initiated
this debate and brought to the forefront the human
rights violations that occur at sea.

9/11: The 9/11 attacks made states realize that the maritime infrastructure can be
vulnerable to terrorist attacks. Attacks against vessels, ports and other maritime
targets could have a tremendous impact on sea trade, the marine environment
and human life. This prompted states to adopt several initiatives that could prevent

Being part of our
customer's journey
throughout the lifecycle

MACGREGOR

UNDERSTAND · CARE · SERVE

Cold Storage
Flexibility
Expertise

INSTANT TIDAL
PREDICTIONS

MARLINK



☰
()
🔍
SUBSCRIBE NOW (/subscribe)


(/)

Monday, April 13, 2020

Media Kit (
http://mediakit.maritime-
executive.com)



# 6681
Views

# The "New" Human Rights at Sea Debate



BY SOFIA GALANI (HTTPS://WWW.MARITIME-EXECUTIVE.COM/AUTHOR/SOFIA-GALANI) 02-12-2018 05:22:45

Dr Sofia Galani, one of Human Rights at Sea's Non-Executive Board of Advisors, gave a presentation at the Bath Royal Literary and Scientific Institution last month on the topic of maritime security and human rights:

The "human rights at sea" debate is rather recent.

There are at least three developments that initiated this debate and brought to the forefront the human rights violations that occur at sea.



**9/11:** The 9/11 attacks made states realize that the maritime infrastructure can be vulnerable to terrorist attacks. Attacks against vessels, ports and other maritime targets could have a tremendous impact on sea trade, the marine environment and human life. This prompted states to adopt several initiatives that could prevent the transfer of terrorists or nuclear weapons by sea or attacks against maritime targets.

Some of these initiatives include the Proliferation Security Initiative that allows the navies of the states that have joined the initiative to stop and search vessels for nuclear weapons, and the ISPS Code that allow port states to refuse entry to vessels suspected of terrorist activities. These operations resulted in the arrest and detention of seafarers. Cases of abandonment of seafarers were also recorded.

**Somali Piracy**: Somali piracy re-started at the beginning of 2000 and is an on-going problem, although of a smaller scale. Several naval operations have been taking place off the coasts of Somalia that include both coalitions, such as the NATO and EUNAVFOR, and independent national navies, such as the U.S. and India. The arrest, transfer, detention and prosecution of pirates became a thorny issue. Billions of pounds were injected in the region in order to ensure that pirates face a fair trial and are not detained in conditions that could amount to ill-treatment and torture.

**Refugee crisis**: The unprecedented numbers of people trying to cross the Mediterranean Sea and the heart-breaking pictures of helpless people on board vessels or people drowning. One shall never forget the picture of the three-year-old Syrian boy, Alan Kurdi, whose body was washed ashore on a Turkish beach.

All these three developments led to increasing maritime enforcement operations. Numerous naval operations take place around the world to enforce maritime order. This, however, can have a significant impact on human rights.

**Human Rights at Sea: Does such a really thing exist?**

There are both legal and practical challenges the prevent the recognition and better protection of human rights at sea.

**Legal Challenges**

When the lawyers and legal academics talk about the oceans, we always refer to the 1982 United Nations Convention on the Law of the Sea (UNCLOS). UNCLOS is one of the most comprehensive international conventions that addresses almost all issues that have to do with the use of the oceans. This is why it is also known as the "Constitution of the Oceans." However, UNCLOS has no reference to human rights, which as a result made us start thinking about human rights at sea quite late.

This is, of course, unsurprising considering that the Convention was drafted back in the 1960s and 1970s when the concept of human rights was not prominent. Also, UNCLOS never intended to deal with human rights issues. The aim of the Convention was to promote the peaceful use of the oceans. To achieve this, UNCLOS addressed issues of maritime delimitation and sought to ensure that all states know what rights and duties they have within the different maritime zones. Under UNCLOS, states now can have their territorial sea, contiguous zone and exclusive economic zone.

The high seas are the international waters where no state has jurisdiction.

So, can we even talk about human rights at sea since UNCLOS makes no reference to it? To answer this question, we will need to look at the human rights framework. Traditionally, there was an understanding that states were only required to protect human rights within their borders. Over the years, and with the increasing activities of states outside their borders, it was accepted that human rights treaties apply extra-territorially when states exercise jurisdiction over a territory or persons. This usually happens when a state exercises effective control over a territory or persons, such in occupied territories or where people are arrested and detained abroad.

Now, if we bring the two legal regimes together – the law of the sea and human rights law – we will see that strictly speaking states have no jurisdiction beyond the 24 nautical miles (territorial sea and continuous zone) limit. This means that states cannot enforce human rights law beyond this point. However, several cases examined by various human rights bodies and courts around the world, such as the Human Rights Committee and the European Court of Human Rights, have now established that state agents are bound by their human rights obligations when they arrest or detain people at sea and when they conduct military operations abroad.

**Practical Challenges**

In addition to the legal challenges we face with the recognition and protection of the human rights at sea, there are also several practical challenges. This means that even today we have started realizing the importance of protecting human rights at sea, but we are still far away from effectively protecting them.

The High Seas cover over two thirds of our Ocean. That's nearly 50 percent of the planet's surface area. The fact that the high seas fall beyond the jurisdiction of any state means that illegal activities thrive within the international waters. Human trafficking, such as the smuggling of migrants and abuse of fishermen, illegal trade of arms, nuclear weapons and drugs, dumping of toxic waste and illegal, unregulated and unreported fishing take place on the high seas where no state has the power to enforce its national legislation.

Piracy, by its very definition found in UNCLOS, takes place on the high seas. This makes the contribution of naval states extremely important to the fight against maritime crime. States invested significant amounts of money in conducting maritime operations that will counter these illegal activities. But, as said earlier, unless states establish jurisdiction outside their territorial seas, they are not bound by the human rights obligations.

The other practical challenge we face is that even if jurisdiction is established, the lack of monitoring and reporting of human rights abuses mean that they go unpunished. If one kills a fisherman or a refugee in the middle of the ocean, no one will probably know about it, and therefore there is no way to either prevent the violation or to hold someone accountable for it.

The other practical challenge we face is that sometimes even if we can hold states accountable for human rights violations, it might prove counter-productive to do so. This happens because we need states to contribute to the fight against maritime crime and by holding them accountable for human rights violations might discourage states from contributing their navies to this fight.

It is also important to remember that the navies operate against adverse weather conditions and unfriendly waters and sometimes operations might go wrong. For example, human rights concerns became a big obstacle to the fight against piracy. Many states out of fear that they will be held accountable for violating the human rights of pirates opted to "catch and release" them without prosecuting them. That meant that once pirates were released, they went back to their illegal activities.

**What is the impact of naval operations on human rights?**

**Case Study 1: Migration at Sea**

We tend to use the terms refugee and migrant interchangeably, but there are legal differences.

The1951 Refugee Convention, negotiated after World War II, defines a refugee as a person who, "owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality, and is unable to, or owing to such fear, is unwilling to avail himself of the protection of that country."

International law dictates that refugees can apply for political asylum or another protected status, sometimes temporary. By law, refugees cannot be sent back to countries where their lives would be in danger (non-refoulment principle).

Anyone moving from one country to another is considered a migrant unless they specifically flee war or persecution. Countries are free to deport migrants who arrive without legal papers, which they cannot do with refugees under the 1951 convention.

Migration at sea is not a new problem, and it is definitely not as new as many people believe. It was the large-scale of the on-going migrant crisis in the Mediterranean Sea that made the problem more visible and made the wider public aware of it.

However, migration at sea dates back to the WWII, if not before. St Louis and Exodus are the often-told stories of the struggle of the European Jews to escape the Nazi regime. Both the U.S. and U.K. pushed the boats back and refused them entry to their waters. Most of the passengers did not survive the trip, and these are only two examples of the hundred of boats that tried to transfer European Jews to the land of what later became the State of Israel.

The term "boat people" we often use in the migration at sea debate refers to the refugees who fled Vietnam, Cambodia and Laos following the end of the Vietnam War in 1978-1979. Estimates talk about almost 200,000 deaths. The primary cause of death was drowning. Other refugees were sold into slavery and prostitution.

Large-scale migration of poor Haitians to the U.S. also date back to 1972 and remains an on-going problem. Poverty and human rights abuses were the main reasons why Haitians tried to flee the country back at the time. However, the natural disasters that battered the country over the last decade only worsened the problem with the U.S. having increased interdiction operations to prevent Haitians from entering the U.S. waters.

The war in Afghanistan also forced many people to flee the country. One of the most well-known cases is the "Tampa affair" in which a Norwegian freighter was refused entry in Australia because it was carrying Afghan refugees rescued from the Indian Ocean. The incident caused political turmoil and led to the adoption of Australian law that diverts refugees to Nauru where their status is examined.

The most recent example of the scale of the problem is the refugee crisis in the Mediterranean Sea. It started with Africans who tried to escape poverty and human rights abuses in the continent and worsened with the rise of the Islamic State in Syria and Iraq. Statistics compiled by the International Organisation for Migration (IOM) show that 2015 was the worse year for maritime migration. One million people crossed the Mediterranean with 3,760 people, including children, recorded dead or missing. While the number of arrivals has declined, the number of deaths reported is still significant. By the end of November 2017, more than 164,650 arrivals were recorded in the Mediterranean with more than 3,000 deaths/missing.

**The response of states**

Immigration comes with lots of security and economic challenges. For example, concerns have been expressed that extremists who joined the Islamic state and received training on how to become terrorists might reach Europe among refugees and migrants. States, such as Greece, that are still recovering from the economic crisis, cannot cope financially with accommodating the refugees and processing their asylum requests. In general, migration is an issue that challenges state sovereignty, and states prefer to decide how to process asylum requests and the quota of refugees themselves.

This is evident in practice as states do everything they can to prevent refugees from reaching their countries. The most common responses at sea are the following:

**Patrols**: National naval forces and the E.U. FRONTEX patrol the waters to deter smugglers from entering the territorial waters.

**Push-back operations**: Naval forces might sometimes push boats that are about to enter the territorial waters of their country back.

**Interdictions**: Naval forces might interdict a boat, transfer the refugees on board their vessel and transfer them back to their country of origin. This practice has been very common in the U.S. that interdicts boats carrying Haitians and with the Italian navy that interdicts and returns people to Libya.

**Rescue Operations**: In these cases, the naval forces try to rescue people in distress.

**Detention on board vessels**: In some cases, once refugees are rescued, they are being brought near the coast but not inside the territorial waters of a country. Refugees are detained on board a navy ship or transfer to another ship until the authorities review their status.

### The Impact on Human Rights

Patrols and push-back operations can have a significant impact on the right to life. Patrols can only force migrants to take a longer and more dangerous route. Push-back operations risk human rights and are in breach of the obligation states to rescue people in distress at sea.

Another problem caused by patrols and push-back operations is that the commercial navy becomes more involved in rescue operations. The problem with the involvement of commercial vessels in rescue operations is that the vessels are usually very large and unable to maneuver, or the crews lack the expertise to conduct rescue operations causing more deaths and injuries at sea. As the Tampa incident also showed, migrants might end up being held on a commercial boat because no state allows them to disembark.

Interdictions also violate the non-refoulment principle and the right to be free from torture. It is a well-established principle in international human rights law that people cannot be sent to a country where they face a real risk of being tortured. The European Court of Human Rights also does not allow the deportation or return to a country where a person will not have a fair trial. A large number of refugees leave their countries, because of fear of persecutions and torture. Interdicting their boats, therefore, and sending them back without examining their status is a clear breach of international law.

Rescue operations can also have a significant on the right to life. It is very often that the poor planning of an operation and exchange of fire with the smugglers might cause the refugee boat to sink and lead to more deaths.

In the case of detention on board, the refugees are intercepted and taken back to the coast, and it is very common for states to transfer refugees on private boats. The refugees remain there detained usually for prolonged periods of time and under dire conditions.

What this case study shows is the conflict between the need to protect human rights and the priority of states to guard their borders and prevent illegal migration. One would expect here that naval operations take place for assisting people in distress, but this is not the case. As explained earlier, the legal challenges, mainly the difficulty in establishing jurisdiction outside a state's territorial waters, and the practical challenges – lack of monitoring and reporting – has made it extremely challenging to protect the human rights of migrants at sea.

### Case Study 2: Piracy and Human Rights

Similar challenges exist in the context of piracy. Again, piracy is a very old problem. Many people started thinking about piracy because of the pirate attacks off the coast of Somalia, but piracy is as old as seamanship and navigation. Piracy also takes place in many regions around the world. It takes place in the Gulf of Aden, in West Africa, in the South China Sea and the Caribbean Sea.

The are also different models of piracy. The most common one is kidnap for ransom. Pirates abduct seafarers and seize their vessels demanding a ransom payment. This model has made piracy a successful business model with almost $500 million paid in ransoms in less than a decade.

Petro-piracy is a model mostly used off the coasts of Nigeria where pirates seize vessels carrying oil. Sometimes they ask for ransoms for the crews or just release them and keep the vessel and the cargo. In the South China Sea, pirates seize the vessels, murder the crews and then they re-register the vessel or they use the vessel as a ghost ship for illegal activities, such as arms and drugs trafficking.

Pirates have also changed. We used to have a romantic idea about piracy, but the money pirates can make out of piracy made them more daring and violent. They are heavily armed, and they have war skills that they are ready to use against seafarers and naval forces.

**The response of states**

A number of naval operations take place around the world. States patrol the waters affected by piracy. If seafarers are abducted and held by pirates, naval operations conduct rescue missions. Naval forces might also arrest pirates, put them on their vessels and transfer them to face trial either in the region or back to their country. Most of the times pirates are transferred to the region, because states do not want to bring pirates home. Pirates will then remain in pre-trial detention until they face a trial and then depending on the case, the evidence and the country, they might face imprisonment of up to 20 years.

The shipping industry also took measures to respond to piracy. One of these measures that have proved very controversial is the use of private armed security guards. These guards are usually hired by a shipowner through a private security company. They will be heavily armed, and they will be put on board vessels to protect them against pirates.

**The Impact on Human Rights**

Obviously, all of these can have a tremendous impact on the human rights of pirates. Lots of pirates have been killed during the exchange of fire. Transferring pirates to a regional court or back home is not easy either. The transfer from Somalia or Nigeria to the U.K. or the U.S., for example, takes months, which means that states need the right mechanisms to ensure that their right to liberty is not violated.

Pirates should not remain in pre-trial detention for too long, because that can also violate their right to liberty. They should also have legal representation and translators, so that they have a right to a fair trial. And, they should never be detained in prisons were the conditions are very poor, because of overcrowding, lack of sanitary facilities, etc, as this would amount to ill-treatment.

This why many states prefer the catch and release policy. What naval forces might choose to do is arrest and disarm the pirates and let them make their way back to the shore. However, this can seriously interfere with their right to life as pirates do not always make it back safely.

Piracy can have a significant impact on the human rights of seafarers. This is something usually overlooked both in the literature and the state's policies. States were so overwhelmed with their obligation to protect the human rights of pirates that they overlooked the human rights of seafarers.

As mentioned earlier, pirates have become daring and violent, and they are willing to do anything it takes to secure their ransoms.

Over the years, there have been lots of testimonies of physical and psychological abuses. Hostages suffer physical and psychological abuses including being punched, pushed, slapped, burned by cigarettes, tied up in the sun for hours, locked in freezers and having fingernails pulled out with pliers. Other reported abuses included systematic isolation, deprivation of privacy, malnutrition and lack of drinkable water. Hostages might also remain in captivity for up to five years.

This has obviously made naval operations and private armed security guards necessary for the protection and release of seafarers. But, the use of force has had a tremendous impact on the right to life of seafarers. Lots of seafarers have been seriously injured or killed during these operations. These operations also severely affect their mental health. Seafarers are simply not prepared to cope with exchange of fire as in a war zone.

The use of private armed security guards has also been problematic. While evidence suggest that vessels with guards on board are less likely to be attacked, seafarers have also reported cases in which drunk armed guards attacked them on board vessel, locked them up in their cabins or seized their personal belongings.

It should also be mentioned that the use of lethal force during naval operations and by private armed security guards has caused the death of several fishermen around the world who were mistaken as pirates and were shot dead.

Having said all this, one might wonder why we have to put all these human rights safeguards in place for pirates who adversely affect sea trade and threaten seafarers. In addition to the core human rights argument that all people have human rights regardless of who they are and what they do, we should never forget that pirates become pirates out of lack of any other opportunities. Somalia is still a failed state battered by civil war and poverty, and this was a gateway for lots of Somalis.

Also, the majority of pirates are below the age of 18. Some of them are as young as 14 or 15 years old. This means that we do have to protect the human rights of these children and make sure that they will be able to reintegrate.

**What can we do to protect human rights at sea?**

Both naval operations and private armed security guards are needed. The illegal activities of non-state actors at sea pose severe threats to maritime order and human life at sea.

It is important that the use of force is appropriately used. Naval forces should try to plan operations accurately in advance, to use force only as a last resort and to take all reasonable precautions to minimize loss of life. The primary aim of these operations should be the protection of human lives, and for that to be achieved medical assistance should also be available.

The use of private armed security guards needs to be clearly regulated and the adoption of a comprehensive legal framework is need here. Appropriate vetting of the armed guards as well as human rights training are also considered necessary. In all cases, better channels of communication, monitoring and reporting mechanisms are needed to improve the responses of naval operations to maritime threats and ensure accountability for human rights violations at sea.

Above all, it is important to raise awareness of the importance of safeguarding human rights at sea.

The opinions expressed herein are the author's and not necessarily those of The Maritime Executive.

**MORE** TOP STORIES

**RNLI Asks Public to Avoid Seagoing Activities Due to Risk for Rescuers (https://www.maritime-executive.com/article/rnli-asks-public-not-to-go-boating-at-sea-due-to-risk-for-rescuers)**

**Carnival Cruise Line Extends Pause (https://www.maritime-executive.com/article/carnival-cruise-line-extends-pause)**

**Charterers Beware: Supreme Court Affirms Strict Liability Standard (https://www.maritime-executive.com/article/charterers-beware-supreme-court-affirms-strict-liability-standard)**

**U.S. Coast Guard to Grant Extensions for BWTS Installation (https://www.maritime-executive.com/article/u-s-coast-guard-to-grant-extensions-for-bwts-installation)**

**EDITORIALS** TOP STORIES

**The Achilles Heel of Shipping (https://www.maritime-executive.com/editorials/the-achilles-heel-of-shipping)**

**Port Denials: What are States' International Obligations? (https://www.maritime-executive.com/editorials/port-denials-what-are-states-international-obligations)**

**Will People Cruise Again? (https://www.maritime-executive.com/editorials/will-people-cruise-again)**

**Vanishing Food Waste Flouts Maritime and National Law (https://www.maritime-executive.com/editorials/vanishing-food-waste-flouts-maritime-and-national-law)**

**NHC Hosts Annual Mariner Decision Makers Weather Workshop (https://www.maritime-executive.com/editorials/nhc-hosts-annual-mariner-decision-makers-weather-workshop)**











## RELATED STORIES

### GOVERNMENT (/GOVERNMENT-NEWS)



(https://www.maritime-executive.com/article/uscg-intercepts-29m-cocaine-shipment-off-costa-rica)

**USCG Intercepts $29M Cocaine Shipment Off Costa Rica (https://www.maritime-executive.com/article/uscg-intercepts-29m-cocaine-shipment-off-costa-rica)**

### TUGS & SALVAGE (/TUGSALVAGE-NEWS)



(https://www.maritime-executive.com/article/seafarer-lost-over-the-side-near-fos-sur-mer-1)

**Seafarer Lost Over the Side Near Fos-sur-Mer (https://www.maritime-executive.com/article/seafarer-lost-over-the-side-near-fos-sur-mer-1)**

### CRUISE SHIPS (/CRUISESHIPPING-NEWS)



(https://www.maritime-executive.com/article/genting-announces-enhanced-covid-19-preventative-measures)

**Genting Announces Enhanced COVID-19 Preventative Measures (https://www.maritime-executive.com/article/genting-announces-enhanced-covid-19-preventative-measures)**

### PORTS (/PORT-NEWS)



(https://www.maritime-executive.com/article/concerned-seafarers-call-for-greater-access-to-ppe)

**Concerned Seafarers Call for Greater Access to PPE (https://www.maritime-executive.com/article/concerned-seafarers-call-for-greater-access-to-ppe)**

# SUBSCRIBE

Print (/subscribe)   Digital (/subscribe)   Newsletter (/subscribe)   Renew (/subscriber/send_subscriber_email)

**The Maritime Executive Comment Policy**
We welcome all relevant and respectful comments.



Comments for this thread are now closed                                    ✕

1 Comment    **The Maritime Executive**    🔒 Disqus' Privacy Policy        ❶ Login ▾

♡ **Recommend**        🐦 Tweet        f Share                     Sort by Newest ▾


**Steve Price** • 2 years ago
A valuable insight and clarification of issues. The historic perspective makes uncomfortable reading.
⌃ | ⌄  • Share ›

**ABOUT US (/ABOUTUS)**
**ADVERTISE (HTTP://MEDIAKIT.MARITIME-EXECUTIVE.COM/2020/)**
**NEWSLETTER (/NEWSLETTER)**
**CONTACT US (/CONTACT)**
**PRIVACY POLICY (/PRIVACY-POLICY)**
**SITE MAP (/SITE-MAP)**

**NEWS (/)**
**FEATURES (/FEATURES)**
**PODCASTS (/PODCAST)**
**MAGAZINE (/MAGAZINE)**
**NEWSLETTER (/NEWSLETTER)**
**BLOGS (/BLOG)**
**DIRECTORY (/MARITIME-DIRECTORY)**
**JOBS (/JOBS)**

Piracy News (/piracy-news)
Shipbuilding News (/shipbuilding-news)
Cruise Ship News (/cruiseship-news)
Ports News (/port-news)
Salvage News (/tugsalvage-news)
Training News (/training-news)
Government News (/government-news)
Environment News (/environmental-news)
Corporate News (/pressrelease)

**SUBSCRIBE**    (/subscribe)



**f** (https://www.facebook.com/MarExMag/)   **in** (https://www.linkedin.com/groups/47685)   **🐦**
(https://twitter.com/Mar_Ex)   📄   (articles.rss)

© Copyright 2020 The Maritime Executive, LLC. All rights reserved.